**In re 1095 COMMONWEALTH
AVENUE CORP., Debtor.**

**In re Bahig BISHAY, Debtor.**

**Bankruptcy Nos. 95–15015–CJK, 95–16331.**

United States Bankruptcy Court,
D. Massachusetts.

Jan. 21, 1997.

William R. Baldiga, William F. McCarthy, Boston, MA, for Citizens Bank of Massachusetts.

Harold B. Murphy, John D. Hanify, Eddirland Duncan, Hanify & King, Boston, MA, for Bahig F. Bishay.

Edward T. Robinson, Wellesley, MA, for 1095 Commonwealth Ave. Corp.

### MEMORANDUM OF DECISION ON MOTION OF CITIZENS BANK OF MASSACHUSETTS FOR APPROVAL OF INTEREST AND REASONABLE FEES, COSTS, AND CHARGES PURSUANT TO SECTION 506(b)

CAROL J. KENNER, Chief Judge.

The motion before the Court presents two principal issues: whether a two-tiered fee agreement between a lender bank and its counsel, which prescribes one rate for services paid for by the bank and a higher rate for the same services when the borrower reimburses the bank for its attorney's fees, is enforceable against the debtor under § 506(b) of the Bankruptcy Code; and whether the bank's failure to disclose that arrangement in its motion for allowance of fees at the higher rate under § 506(b) warrants sanctions under F.R.Bankr.P. 9011(a).

By the motion before the Court, Citizens Bank of Massachusetts, a secured creditor in this case, seeks an order allowing, as part of its secured claim, postpetition interest at the default rate through the date of payment, attorney's fees and expenses of $262,419.40 (for work performed by the firm of Brown, Rudnick, Freed & Gesmer ("BRF & G")), additional legal fees in the amount of $543.19 (for work performed by the firm of Goodwin, Procter & Hoar), late fees of $8,388.99, and appraisal expenses of $11,175.00, all pursuant to § 506(b) of the Bankruptcy Code. The Debtors, Bahig Bishay and 1095 Commonwealth Avenue Corp., oppose the motion on numerous grounds, ask that it be denied in its entirety, and seek attorney's fees as a sanction under Rule 9011(a) for the portion of the motion demanding compensation for the fees and expenses of BRF & G. For the reasons set forth below, the Court will allow postpetition interest at the default rate, deny late fees, deny compensation for the legal fees of Goodwin, Procter & Hoar, allow ap-

praisal expenses in the amount requested, and allow compensation for the attorney's fees and expenses of BRF & G in the amount of $204,936.07. Also, the Court will enter a sanction against Citizens under Rule 9011(a) in the amount of the reasonable attorneys' fees that the Debtors incurred in filing their supplemental opposition to this motion, conducting discovery on the blended-rate agreement complex of issues, and in litigating those issues, which sanction shall be set off against the dividend to be paid on Citizens's allowed secured claim. The Court will also deny reimbursement to Citizens for the attorney's fees it incurred in conjunction with the present motion.

## LEGAL FEES OF BROWN, RUDNICK, FREED & GESMER

### a. *Procedural History*

The largest and most controversial item in this motion is the Bank's request for compensation for the fees and expenses of the law firm of Brown, Rudnick, Freed & Gesmer. The firm represented Citizens in conjunction with the Debtors' obligations to Citizens both before and during these bankruptcy cases.

Citizens filed this motion on May 23, 1996. With the motion, Citizens submitted the supporting affidavit of Richard M. Barry, a vice president of Citizens and the officer responsible for administration of its loans to Bishay, which were guaranteed by 1095 Commonwealth Avenue Corp. The motion recites that, through May 17, 1996, Citizens has incurred obligations to BRF & G for $238,-119.50 in fees and $19,764.71 in costs and expenses,[1] and Barry corroborates this in his affidavit. The Debtors filed their initial opposition to the motion on June 10, 1996. With respect to the fees and expenses of BRF & G, this initial opposition argues that the fees are excessive and, in part, not properly documented; therefore, they should be

reduced "substantially" from the amount demanded. (The Debtors do not specify an amount.)

On July 8, 1996, the Debtors filed a supplemental opposition in which they allege, on the basis of newly discovered evidence, that Citizens employed in this case a dual billing practice with respect to the fees and expenses it owes to BRF & G. By this practice, Citizens allegedly agreed with BRF & G that it would pay for the firm's services at a blended hourly rate of $195 per hour, but that if the firm's services were paid for or reimbursed by the borrower, the firm's higher standard hourly rates would apply. The Debtors further allege that Citizens intentionally failed to disclose the existence of this arrangement in its motion. In the supplemental opposition, the Debtors argue that the dual billing system violates all notions of good faith and fair dealing and constitutes an unfair and deceptive practice in violation of Massachusetts G.L. c. 93A. And they further argue that the deliberate concealment of this practice warrants (a) denial of "all fees and expenses sought in the motion," (b) reduction of Citizens' principal claim by the amount of the cost to the Debtors of discovering and bringing this matter to the Court's attention, and (c) a surcharge of Citizens in an amount appropriate to remedy the use of this practice against all debtors in this Court.[2]

The next day, July 9, 1996, Citizens filed a response to the supplemental opposition and, with BRF & G, a joint statement concerning their fee agreement and its disclosure. In the response, Citizens voluntarily reduced the amount of attorney's fees it was requesting by a total of $33,651.50. This consisted of $11,959.00 "in recognition of certain confusion regarding Citizens's fee arrangements with its counsel, Brown, Rudnick, Freed & Gesmer," and of $21,692.50 "solely on account

---

1. These amounts total only $257,884.21, which is $4,535.19 less than the total of $262,419.40 that the motion demands for these items. The error appears to be in the summation of expenses and disbursements, which, by the Court's calculation, total not $19,764.71, but $24,299.90.

2. The Debtors also suggested that the dual billing practice and its concealment from the Debtors might justify revocation of the order confirming

the joint plan of reorganization in these cases. However, the Debtors have not pursued this remedy and have not invoked the necessary process. See F.R.Bankr.P. 7001(5) (a proceeding to revoke an order confirming a chapter 11 plan is an adversary proceeding and is governed by the rules of Part VII of the Federal Rules of Bankruptcy Procedure).

of the poor time descriptions used for [ ] time entries" made by BRF & G attorney Stephen J. Mastrovich. Despite its voluntary reduction for the time entries, which Citizens conceded were of poor quality, Citizens reaffirmed that all time entries reflected the actual amount of time that Mastrovich has reasonably spent on these matters.

The Court held a preliminary hearing on the motion on July 10, 1996. At the hearing, the Court heard testimony by Mastrovich as to his time entries and also as to the firm's fee arrangement with Citizens, which he, as the firm's principal liaison with this client, had negotiated. From this testimony it became clear that the motion warranted further discovery and a full evidentiary hearing.

The parties filed pretrial memoranda outlining the legal theories on which they are proceeding. The Debtors' memorandum, filed on the eve of the evidentiary hearing, for the first time in conjunction with this motion makes an argument for sanctions against both Citizens and BRF & G for violating Rule 9011(a) by misrepresenting and concealing the dual fee arrangement in the motion and in Barry's affidavit in support of it. (BRF & G is not a party to this motion in its own right; to the Court's knowledge, no motion for sanctions has been filed as to BRF & G.) The evidentiary hearing was held on October 24 and 29, 1996, after which the Court took the motion under advisement.

#### b. *Dual Billing Arrangement*

The paramount issues raised as to BRF & G's fees are those concerning the "dual billing arrangement": How and to what extent is it relevant to this motion? Does it exist? Is it enforceable? If so, at what rate? To what extent was Citizens or the firm, as its agent, at fault for failing to disclose it? And, in view of the answers to these questions, what remedy is appropriate? If, as the Debtors maintain, the practice and its concealment warrant denial of the entire BRF &

G component of this motion, the remaining challenges to these fees will be moot.

#### 1. *Relevance and § 506(b)*

■ Citizens starts with relevance. The dual rate issue is much ado about nothing, argues Citizens, because even if such an arrangement were unfair and unenforceable against the Debtors, it would be irrelevant to the allowance or disallowance of the fee under § 506(b), which governs this motion. Citizens argues that in determining whether to allow a fee under § 506(b), the relevant inquiry is what amount is reasonable, not what amount was agreed upon between the secured creditor and its counsel, and that the fee agreement itself is entirely irrelevant to the determination of what is reasonable.

The Court disagrees. Under subsection 506(b),[3] the Court must allow attorney's fees as part of a secured claim only where and to the extent that (1) the creditor has an allowed secured claim, (2) the value of the collateral exceeds the principal amount of the claim and any charges allowed under § 506(c) by enough to permit payment of the fees, (3) the underlying agreement between debtor and creditor provides for payment of the fees requested, and (4) the requested fees are reasonable.

The underlying fee agreement between creditor and its attorney is relevant to this test in two respects. First, ordinarily, as in this case, the agreement between the creditor and the debtor provides that the creditor shall be reimbursed only for fees it incurs. Where a fee agreement exists between the creditor and its attorney, the agreement is crucially relevant to determining what fees are incurred. Thus the fee agreement is relevant to the third of the four issues: whether the underlying agreement provides for payment of the fees requested.

■ Second, the fee agreement is relevant to the determination of how much is reasonable. Whether the requested amount

---

**3.** Section 506(b) states:

To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such

claim, interest on such claim, and any reasonable fees, costs, and charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

is reasonable is a question of federal law on which the courts typically employ some version of the lodestar analysis. Under this analysis, a "lodestar" is determined by multiplying the number of hours reasonably expended by a reasonable hourly rate, and this amount is then adjusted upward or downward according to various considerations enumerated in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974). *Hensley v. Eckerhart*, 461 U.S. 424, 433–434, 103 S.Ct. 1933, 1939–1940, 76 L.Ed.2d 40 (1983). The rate agreed upon between the creditor and its attorney is directly relevant to the most basic element in this analysis: the reasonable hourly rate. Although it is not dispositive, an attorney's actual billing rate is the starting point, especially where, as the product of arm's length bargaining, it reflects the market value of the attorney's services.

In a case cited by Citizens, the Seventh Circuit Court of Appeals stated that an attorney's standard hourly rate was the presumptive appropriate rate. *Gusman v. Unisys Corp.*, 986 F.2d 1146, 1150–1151 (7th Cir. 1993). But *Gusman* only confirms the relevance in this case of the negotiated billing rate. It employed standard rates only because they reflected what attorneys could earn from paying clients and thus reflected market value. *Id.* at 1150. Where, as the Debtors allege in this case, Citizens, as a major client of BRF & G, agreed to employ the firm only at a negotiated rate that was less than the firm's standard rates, the actual negotiated rate displaces the standard rate and becomes the presumptive reasonable rate.

The negotiated rate is also important among the considerations enumerated in *Johnson v. Georgia Highway Express, Inc.* In that case, the court stated: "The fee quoted to the client or the percentage of the recovery agreed to is helpful in determining the attorney's fee expectations." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d at 718. Later, the court added that "[i]n no event should the litigant be awarded a fee

greater than he is contractually bound to pay, if indeed the attorneys have contracted as to amount."

The Court concludes that the dual rate issue is relevant to Citizens' motion.

### 2. *The Fee Agreement*

Under what agreement as to fees and expenses did BRF & G represent Citizens in the Bishay and 1095 Commonwealth Avenue Corp. matters? The evidence was somewhat conflicting on this point. During the period to which this motion pertains—from April 18, 1995, through May 17, 1996—the evidence shows that, with respect to all loan workout, restructuring, foreclosure, and debt recovery activities (collectively, "workout services") for which Citizens retained BRF & G, including the matters at hand, Citizens employed BRF & G under a "blended rate" agreement. It provided that all workout services provided by BRF & G attorneys would be billed to Citizens at the lower of BRF & G's standard hourly rates or the blended rate of $195 per hour; except that the blended rate would not apply to those services for which Citizens's legal fees were paid for or reimbursed by the borrower. In the latter cases, BRF & G would be compensated at its standard rates, not at the blended rate. This agreement was negotiated and put in place in April, 1995, but was retroactive to February, 1995. It was to have been effective for a term of one year, until April, 1996. However, Citizens and BRF & G continued to abide by the agreement through May, 1996, when it was renegotiated.[4]

The blended rate agreement governed only fees. Citizens and BRF & G had a separate agreement for expenses and disbursements. (Ex. 9B(3)) On behalf of BRF & G, Mastrovich agreed that the firm's representation of Citizens would be subject to guidelines and procedures promulgated by Citizens. The guidelines identified and limited the expenses and disbursements for which Citizens would reimburse BRF & G; they permitted fewer expenses and disbursements than BRF & G would normally have passed on to its clients.

---

**4.** The renegotiated agreement took effect on June 1, 1996; it increased the blended rate to $205 per hour.

(Exhibit 18, pp. 8–12) Citizens promulgated the guidelines and policies in May, 1995, and the firm (by Mastrovich) agreed to abide by them on July 11, 1995. They governed billing for all services provided by BRF & G with respect to these Debtors from that date through the billing periods relevant to this motion.

Unlike the blended rate agreement, the agreement as to expenses applied to all workout matters for which Citizens retained BRF & G, regardless of whether Citizens recovered its attorney's fees and expenses from the borrower. There was testimony to the contrary: Edward Barrett, who had negotiated this agreement for Citizens, testified that he understood that if BRF & G were to apply to a court against the borrower for reimbursement of Citizens's fees and expenses, it was free to recover from the borrower even those fees for which Citizens itself was not liable. (Tr. p. 175.) I do not construe Barrett's testimony as a fair restatement of the agreement between the Bank and the firm; the agreement simply contained no exception or contingency for those situations where the borrower paid the firm's expenses. Rather, Barrett was merely expressing the position that Citizens had no objection to BRF & G's recovering more from the borrower than Citizens itself was obligated to pay.

BRF & G viewed Citizens as a potential high-volume client, and the promise of volume gave Citizens leverage. It was by promising to use BRF & G for a significant volume of its workout business that Citizens was able to obtain the firm's services on better terms than the firm offered its other clients. In these negotiations—and later in monitoring BRF & G's invoices—Citizens was keenly concerned with the rates and expenses it would have to bear. It maintained records of the firm's blended rate, but kept no records of its standard hourly rates. Moreover, even in cases where it was possible or likely that Citizens would recover its attorney's fees from the borrower, Citizens made its monthly payments to BRF & G at

the blended rate, not standard hourly rates; it paid only the limited expenses permitted by Citizens's guidelines, not the full measure of expenses and disbursements for which BRF & G would normally have expected compensation; and it did not even bother to keep track of the difference between the amount it paid and the amount that would have been due under BRF & G's standard rates and normal billing practices. Citizens simply had no concern for this difference, because Citizens, as opposed to its borrowers, would never have to pay it. It would not be accurate to say that, as part of the dual rate agreement, Citizens agreed to pay standard hourly rates and full expenses in certain matters. More accurately, Citizens merely agreed to allow BRF & G to recover the higher rates from its borrowers.

### 3. *The Debtors' Obligation to Reimburse*

█ Under the Forbearance Agreement between the Debtors and Citizens, executed on September 16, 1994, Bishay must pay the legal fees and expenses "incurred by Citizens" from July 1, 1994 forward in connection with its enforcement of the underlying Demand Note. The operative language in other related loan documents is similar. These documents define the amount of Bishay's fee obligation only by reference to the liability that Citizens incurs.

Citizens maintains that under the blended-rate agreement with BRF & G, and in view of the fact that the value of Citizens's collateral will permit full payment of Citizens's claim, even to the extent of attorney's fees at the higher standard hourly rates and full expenses and disbursements, Citizens is obligated to pay, and the Debtors must reimburse Citizens for, BRF & G's fee at standard hourly rates, with full expenses and disbursements. This is what Citizens' motion requested. (Citizens has since reduced its demand, but not as much as the blended rate would require,[5] and it has not reduced the expenses and disbursements.)

---

5. Citizens voluntarily reduced the fee demand by $11,959. However, by the Court's calculation, reduction to the blended rate would have required a cut of $17,571.50. At standard hourly rates, BRF & G's fees for 1060.7 attorneys' time totaled $224,408.00. At the blended rate of $195/hr., the same time would have totaled only $206,836.50, a difference of $17,571.50.

The Debtors respond with essentially two arguments. First, they argue they are obliged to pay only the obligations that Citizens itself has first incurred, which under the agreements is only the blended rate and limited expenses. And second, they argue that even if, under the agreements, Citizens is deemed liable for the full rates and expenses, enforcement of the agreements against the Debtors would be fraudulent, illegal, contrary to public policy, and a violation of the implicit covenant of good faith and fair dealing. To this latter argument Citizens responds that the fee agreement is a common limited contingency agreement that the law will enforce against indemnifiers.

With respect to the Debtors' first argument, the Court agrees that the blended rate agreement cannot obligate the Debtors to pay full rates. Under that agreement, Citizens becomes liable for full rates only upon the borrower's payment of full rates; to the extent that Citizens itself funds the fee without reimbursement, the lower rate applies. Therefore, unless and until the borrower pays the fee at the full hourly rates, the borrower—who is obliged to pay only what Citizens is obliged to pay—need pay only the blended rate. The upshot is that Citizens cannot establish entitlement to full hourly rates without the borrower's first making payment at those rates, which in this case has not occurred and in any case would not occur: no borrower would knowingly and willingly pay the higher rate unless he or she were first obligated to pay it. In short, the agreement is, by force of logic, unenforceable against the Debtors except at the lower rates. Though clearly it was intended to create a two-tier billing system that would impose on borrowers higher rates than Citizens itself agreed to bear, it fails to do so. The obligation it appears to create for borrowers to pay fees at the higher rate is illusory.

The Debtors' second argument is that enforcement of the blended rate agreement against the Debtors would be fraudulent, illegal, contrary to public policy, and a violation of the implicit covenant of good faith and fair dealing. Having held that the agreement does not in fact require of the Debtor any more than payment of the lower rate without expenses, the Court need not address this argument.

### 4. *Nondisclosure and Misrepresentation*

The Debtors contend that, in its motion, Citizens both misrepresented the nature of the fee agreement between itself and BRF & G and, despite an affirmative obligation to do so, failed to disclose the blended rate agreement. Citizens denies that it made misrepresentations, and it argues that it had no duty to disclose the fee agreement in the motion.[6]

The Court begins with the following findings. Citizens filed this motion and Barry's supporting affidavit on May 23, 1996. Neither the motion nor the affidavit discloses the underlying agreements as to blended rate and expenses and disbursements. Rather, the motion states: "The retention agreement between Citizens and its counsel provides that Citizens will pay BRF & G's normal hourly rate for all work performed."[7] It also states: "As of May 17, 1996, Citizens had incurred $238,119.50 in fees and $19,764.71 in costs and expenses ... in connection with the recovery of the Debtors' indebtedness to Citizens." These amounts represent compensation at standard hourly rates, with full expenses. Likewise, Richard Barry states in his affidavit: "Citizens has incurred out-of-pocket costs of collection, including attorney's fees and professional fees and expenses though May 17, 1996, in the total amount of approximately $274,137.59."[8] The itemization attached to Barry's affidavit shows that, insofar as this amount is comprised of the fees and expenses of BRF & G, it represents standard hourly rates and full expenses. In summary, Citizens not only

---

**6.** Citizens concedes that it was obligated to produce and disclose the agreement in response to the Debtors' later discovery requests. The issue presented here is whether Citizens was obligated to disclose the agreement in the motion, before being asked to do so.

**7.** Motion, ¶ 16.

**8.** Barry Affidavit, ¶ 12.

did not disclose the underlying agreements; it affirmatively represented that Citizens had retained BRF & G at it normal hourly rates.

As a description of the agreements, this representation misleads by omitting the fact that, as to fees, BRF & G was entitled to payment at full hourly rates only if and to the extent that the fee burden was born by the Debtors instead of by Citizens; and that, as to expenses and disbursements, BRF & G was entitled only to the limited expenses and disbursements permitted by Citizens guidelines. These were material terms, whose omission rendered the representations false and quite misleading.[9]

The omission and consequent misrepresentation here are all the more stark and misleading for two reasons. First, the Debtors' obligation here is one of indemnity. As against BRF & G, the Debtors stand in Citizens's shoes and are entitled to the benefit of any defenses and limitations on liability that Citizens can assert. For the most part, these will be known to Citizens and not to its borrowers, so it is incumbent on Citizens, by any measure of fairness, to disclose the known defenses that Citizens itself would assert against BRF & G if it were paying the bill.

Second, the dual-rate agreement between Citizens and BRF & G is, if not fraudulent, at least deserving of close scrutiny. Had these two entities agreed on one rate and then demanded reimbursement from the Debtor at a higher one, their demand would be unenforceable and, if made without disclosure to the Debtor, plainly fraudulent. The only difference here is that the higher rate is built into the agreement itself as a "contingency," which permits both parties to maintain that Citizens itself is actually liable for the higher rate. But the contingency that creates the higher liability is nothing other than that the borrower pays the fee. Under no circumstances would Citizens itself ever bear the burden of the higher rate.[10] I accept Citizens's argument that contingency agreements are generally enforceable against indemnitors. However, where the contingency is that the indemnitor pays the fee, it is nothing but a euphemistic fiction to call this a contingency fee. This is an attempt to couch in legitimacy what is in essence the illegitimate practice of billing the borrower for more than the lender is liable. Where this is done *without disclosure of the underlying agreement,* and the nondisclosure is intentional, I cannot distinguish it from fraud.

The Court concludes that, both by what they actually stated and by what they omitted, the Citizens motion and Barry's supporting affidavit misrepresented the underlying agreement between Citizens and BRF & G and the extent of Citizens's liability thereunder.

### 5. *What Fault?*

The Debtors argue that Citizens's nondisclosure and misrepresentation of the blended rate agreement were intentional and fraudulent and, as such, warrant complete denial of BRF & G's fees and expenses and an award of attorney's fees for uncovering this fraud. Citizens makes four arguments in response. Two have already been rejected: (1) that the blended rate agreement was irrelevant to this motion, such that Citizens had no duty to disclose it; and (2) that, under the facts of this case—especially that Citizens collateral would afford payment in full of attorney's fees, even at standard rates and with full expenses—the blended rate agreement did not apply, so that Citizens's statement that it retained BRF & G at normal hourly rates

---

9. Citizens might respond that its statement (that the retention agreement provides for normal hourly rates) was not a factual description of the agreement but merely a legal opinion or legal conclusion as to what rates the agreement permitted BRF & G to apply in these circumstances, and that a mistake as to opinion is not fraudulent. However, the statement was *not* flagged as a statement of opinion; certainly there was no discussion of the facts and theory justifying the opinion or even an indication that the terms of the agreement were less than straightforward on this issue. The Court concludes that the statement was presented and reasonably understood as one of fact, and that it misrepresents the underlying agreements.

10. The evidence showed that BRF & G's normal hourly rates were never the subject of discussion or negotiation between the firm and Citizens. There was no need for such discussion or negotiation because Citizens never intended to pay those rates or become liable to pay them.

was true. The Court has ruled that the blended rate agreement is relevant and that it does apply in this matter, giving the Debtors the benefit of the blended rate and limited expenses, such that Citizens's statement was false. This leaves the third and fourth arguments: (3) that the evidence demonstrates that Citizens misrepresentation and failure to disclose were not intentional but rather the result of "gaps of understanding and failures of communication"; and (4) that Citizens had no motivation to conceal the dual rate arrangement; such arrangements are permissible and have been upheld under Massachusetts law.

■ I reject first the argument that dual rate agreements of the kind presented here have been upheld under Massachusetts law, such that Citizens had no motivation to conceal its fee agreement. The cases that Citizens cites stand for no more than the proposition that contingency fee agreements are generally valid and binding under Massachusetts law.[11] None deals with the peculiar contingency of this agreement: that if the borrower pays the fee, the rate shall be higher than if the lender were to bear the fee burden. This "contingency" differs significantly from any that the Massachusetts cases have addressed or legitimated. Moreover, under Massachusetts law, a court may, even on its own motion, inquire into the reasonableness of a contingent fee agreement, and the attorney bears the burden of establishing reasonableness as a condition of the receipt of his or her fee. *Snow v. Mikenas*, 373 Mass. 809, 812, 370 N.E.2d 1001 (1977); *Northern Heel Corp. v. Compo Industries, Inc.*, 851 F.2d 456, 475–476 (1st Cir.1988). Consequently, the legitimacy under Massachusetts law of enforcing Citizens's dual rate agreement against the Debtors was at best dubious. Citizens did not lack cause to hide the agreement from scrutiny.

Citizens's final argument concerns intent. The Court must determine the degree of fault with which Citizens misrepresented and failed to disclose the fee and expense agreements. This inquiry involves principally three individuals—William Baldiga and Steven Mastrovich of BRF & G and Richard Barry of Citizens—and Citizens generally.

### A. *William Baldiga*

William Baldiga, a partner at BRF & G who specializes in bankruptcy, has been the lead attorney for Citizens during these bankruptcy cases. He oversaw the filing of the present motion. Baldiga testified that when he filed this motion, he was unaware of the existence of the blended rate agreement and believed that Citizens had retained BRF & G at its standard hourly rates.

I make the following findings. Before he filed the motion, Bishay's counsel, Harold Murphy, asked Baldiga whether Citizens had a special fee agreement with the firm. To answer Murphy's question and to insure that the motion he was preparing would be accurate, Baldiga asked Mastrovich what rates applied to BRF & G's representation of Citizens in the Bishay matters. Mastrovich told him that the Bishay matters were subject to standard hourly rates. In a second conversation, following more discussion between Murphy and Baldiga, Baldiga asked Mastrovich whether it would change anything if Bishay did not reimburse the Bank. Mastrovich responded that it would not change anything and that the Bishay matters were subject to full hourly rates, the firm's normal billing practices. Knowing that Mastrovich was the firm's representative to Citizens and the billing attorney on Citizens matters, Bal-

11. See *Northern Heel Corp. v. Compo Industries, Inc.*, 851 F.2d 456, 475–476 (1st Cir.1988) (Citing *Snow v. Mikenas*, 373 Mass. 809, 370 N.E.2d 1001 (1977), the Court of Appeals held that under Massachusetts law, contingency fees are generally lawful and should be enforced unless unreasonable under the circumstances.); and *Trustees of Tufts College v. Ramsdell*, 28 Mass. App.Ct. 584, 554 N.E.2d 34, *review denied*, 407 Mass. 1104, 556 N.E.2d 1037 (1990) (under Massachusetts law, borrower may be liable for attorney's fees if the promissory note expressly provides for them, but the lender's recovery shall be limited to an amount that is found to be fair and reasonable; Appeals Court affirmed ruling that contingency fee of thirty percent of amount recovered was unreasonable under the circumstances and that recovery should be limited to fifteen percent; no discussion of enforceability of contingency fee agreements under state law).

diga accepted Mastrovich's answer and filed the motion on the basis of it.[12]

Despite his testimony, two documents show that Baldiga had previously been made aware of the blended rate agreement. Baldiga had in his personal files (as opposed to his Bishay case files) a copy of a document, entitled "Fee Proposal—Loan Workouts," that set forth the terms of the blended rate agreement. The document has Baldiga's name in an upper corner and bears his handwritten notes on its face and on its reverse side. The note on the face (which reads "Payment of bills—timing?") pertains to the subject matter of the document and, I conclude, establishes that he read the document. The notes on the back are from a meeting with representatives of Citizens that Baldiga attended on April 13, 1995. The meeting was part of an effort by members of BRF & G to persuade Citizens to employ the firm for some significant volume of its workout business. Baldiga testified that the blended rate agreement was not discussed at that meeting.

The second document is a memorandum, dated April 21, 1995, from Baldiga and Mastrovich to BRF & G's accounting department. Mastrovich authored the document but Baldiga approved and initialed it. It reads: "The attached is the agreement between BRF & G and Citizens Bank that was agreed upon at our recent meeting. This is to be in effect for all bills beginning February 1, 1995. If you have any questions, please contact any of the above." Attached to the memorandum is an expanded version of the document entitled "Fee Proposal—Loan Workouts," setting forth the terms of BRF & G's agreement with Citizens.

As a member of BRF & G's Policy Committee, Baldiga also received a third document. Dated April 6, 1995, it is a memorandum from Mastrovich and two others to the Policy Committee, explaining and seeking the committee's approval of the blended rate billing agreement with Citizens. However, the Committee never acted on this memorandum—because, its chairman testified, Mastrovich did not need the Committee's approv-

al to enter into this agreement—and it is not clear that Baldiga ever actually read this document.

Still, it is clear from the other two documents that, in April, 1995, Baldiga was aware of the agreement. Nonetheless, he testified that in May, 1996, when he filed this motion, he recalled neither these documents nor any special fee agreement with Citizens. His testimony is plausible: the events at issue had occurred thirteen months earlier; although he had been informed of the agreement, he had not negotiated it; and, unlike Mastrovich, he had not in the intervening thirteen months served as the billing attorney for Citizens and dealt with details of the agreement and of the relationship with Citizens on a monthly basis. Moreover, Baldiga testified credibly, and he has voluntarily brought damaging evidence to light as he discovered it. As for the agreement on expenses and disbursements, the Court has no evidence that he knew of that agreement before filing this motion. Although the evidence is not conclusive either way, I find by a preponderance of the evidence that Baldiga was unaware of both agreements when he filed this motion, and that he did not intentionally deceive the Court or the Debtors as to their terms.

## B. *Steven Mastrovich*

Steven J. Mastrovich was a contract partner who handled the Bishay matter for Citizens before the Debtors commenced these bankruptcy cases, at which time he handed the matter over to Baldiga. Mastrovich was also the partner at BRF & G who, from at least April, 1995, through May, 1996, was the firm's liaison or representative to Citizens. On behalf of BRF & G, he negotiated and entered into the blended rate agreement with Citizens in April, 1995, and the modification to that agreement in May, 1996; and he signed the agreement whereby the firm agreed to be bound by Citizens's guidelines as to expenses and disbursements. He was also responsible for preparing, and did pre-

---

12. Baldiga made no other inquiry into the fee agreement. He did not examine the firm's invoices to Citizens, check with the firm's accounting department, or check with Ed Barrett or anyone else in Citizens's legal department.

pare, the firm's monthly invoices to Citizens, including those for its work on these cases.

In response to Baldiga's questions about the terms of Citizens's retention of BRF & G, Mastrovich supplied the information that Baldiga relied on in drafting and submitting the motion: that the Bishay matter was subject to BRF & G's standard hourly rates, even if Bishay did not reimburse the Bank. Mastrovich's response was misleading in three respects. First, Mastrovich was wrong as to what rate the blended rate agreement permitted Citizens to charge to the Debtors. Second, he failed to disclose that the Bishay matters were subject to the agreement as to expenses and disbursements, which was considerably more restrictive than the firm's normal billing practice. And third, by answering that it made no difference whether Bishay reimbursed the Bank, Mastrovich misrepresented the nature of the underlying fee agreement and either implied that the dual-rate agreement did not apply to the Bishay matters or effectively concealed that agreement from Baldiga.

When he made these representations to Baldiga, Mastrovich knew that Baldiga was seeking the information for purposes of drafting this motion and seeking allowance of Citizens's claim for attorney's fees. He also knew of the blended rate agreement and of the agreement as to expenses and disbursements. He had negotiated those agreements and dealt with them monthly throughout the Bishay bankruptcy. He knew that the cover letters he drafted and attached to the monthly invoices he had sent to Citizens with respect to the Bishay matter informed Citizens of the fee according to the blended rate agreement.[13] As billing attorney for Citizens matters, he also knew that Citizens had repeatedly and consistently refused to pay the firm's standard hourly rates and normal expenses on the Bishay matters. In February and again in April, 1996, he met with Ed Barrett of Citizens about these very issues.

Most importantly, Mastrovich knew that the Bishay matters were subject to both the blended rate agreement and the agreement limiting fees and expenses. He did believe that, pursuant to these agreements and because these Debtors had sufficient assets to pay Citizens's claim in full, BRF & G was entitled to collect its full standard rates and expenses. However, as a corollary, he also understood clearly that the firm's entitlement to full rates and expenses was contingent on Bishay's payment of the claim in full, including the firm's fees and expenses.[14] Baldiga's

13. Most, but not all, of the invoices stated:
 The attached invoice has been billed using our standard rates. At our negotiated blended rate for this case of $195.00 per hour, the total amount of this invoice is: []....
 If the borrower is required either to (1) pay our bills directly or (2) reimburse Citizens for the bill, the borrower should pay the full amount as set forth on the attached description. If, however, Citizens is responsible for payment of our bills and not the borrower, then pursuant to the blended rate agreement, Citizens may pay the discounted amount above in full satisfaction of the attached bill.

14. Mastrovich testified that he believed the blended rate agreement did not apply to the Bishay matters for three reasons: (1) the agreement did not yet exist when BRF & G took on the case in February, 1995; (2) Bishay had consensually paid Citizens's attorney's fees in conjunction with the 1994 restructuring of his loan; and (3) his conversations with Robert Bender in the summer of 1995, when Bender was the Citizens loan officer on the Bishay matter, led him to believe that the Bishay matters would be treated outside the agreement. Mastrovich's testimony was not credible. First, Mastrovich knew that the blended rate agreement was retroactive to February, 1995, and applied to all workout matters. Second, Mastrovich knew that Bishay was not paying BRF & G's fee consensually; and, in any case, consensual payment would not take the matter out of the scope of the agreement. And third, Mastrovich's conversation with Bender dealt only with a limited time, the summer of 1995, and was based on the assumption that Citizens would, by virtue of a foreclosure sale scheduled for August, 1995, be paid in full by the end of the summer. In any case, the conversations did not produce an agreement to exempt the Bishay matter from the blended rate agreement, and Mastrovich well knew this. Moreover, some of the invoices that Mastrovich himself had sent to Citizens for the Bishay matters, especially during the summer and fall of 1995 (the period during which Mastrovich says Bender agreed to treat the Bishay matters outside the blended rate agreement), quoted the firm's fee at both the blended rate and the full hourly rates, and stated, "If . . . Citizens is responsible for payment of our bills and not the borrower, then pursuant to the blended rate agreement, Citizens may pay the discounted amount above in full satisfaction of the attached bill." And, as Barrett testified, he and Mastrovich had, in February and April, 1996, discussed the manner in which the blended

second question of Mastrovich—"Does it change anything if Bishay doesn't reimburse the Bank?"—was designed and intended to determine whether the Bishay matters were subject to a dual rate agreement. Mastrovich understood this, but by his response deliberately concealed the agreements from Baldiga and, effectively, from the Debtors and the Court.

### C. *Richard M. Barry*

Richard M. Barry is the Citizens loan officer who, when this motion was filed, was responsible for administering the Bishay loan. He filed the affidavit in support of this motion. In his affidavit in support of the motion, Barry stated: "I have reviewed the invoices submitted by our counsel, Brown, Rudnick, Freed & Gesmer"; and "Citizens has incurred out-of-pocket costs of collection, including attorney's fees and professional fees and expenses though May 17, 1996, in the total amount of approximately $274,137.59." The itemization attached to Barry's affidavit shows that, insofar as this amount is comprised of the fees and expenses of BRF & G, it represents standard hourly rates and full expenses.

The evidence adduced shows that, when he submitted this affidavit, Barry had neither seen the invoices nor conducted a review of their contents. Moreover, although he had reason to believe that Citizens may have entered into a special rate agreement with BRF & G that would have applied to the Bishay matter, he made no inquiry into the matter. He testified that BRF & G had drafted the affidavit for him and that he signed it on their instruction and in reliance on their advice, but without personal knowledge of the hours and expenses billed, of the governing fee agreement, or of Citizens's treatment and payment of BRF & G's invoices during the relevant period. He knew when he signed the affidavit that it would be submitted in support of a motion intended to obtain reimbursement from Bishay of Citizens's legal fees. He read the affidavit and even made a small modification before he

signed it. And he explicitly signed the affidavit under the pains and penalties of perjury.

Barry's affidavit contains two very serious misrepresentations. The first is that he had personal knowledge of the invoices, of the fees incurred, and, implicitly, of the governing fee agreement. I find that Barry made this misrepresentation intentionally. He knew that he had neither reviewed the invoices nor inquired into Citizens's fee agreement with BRF & G, yet he knowingly represented that he had reviewed the invoices and that Citizens's had incurred fees in an amount calculated according to standard hourly rates.

■ The second misrepresentation is that Citizens had incurred fees in the amount he stated. Citizens had not incurred more fees than were payable under the blended rate agreement. Much less was Citizens "out-of-pocket" for fees at standard hourly rates: Citizens had never actually paid more than the blended rate. If Barry had made even a cursory check, he would have known this. The information was readily available from Edward Barrett, a senior vice-president at Citizens, who was also Citizens's general counsel and chief of its legal division. Barrett negotiated the blended-rate agreement for Citizens and had monitored all BRF & G's subsequent invoices for compliance with the agreement. His office kept records of Citizens's fee agreements with its outside counsel. Had Barry asked him, as he should have, Barrett might have informed him of the blended-rate agreement. But Barry never checked with Barrett or with anyone. I find that Barry made this misrepresentation without intent to deceive: he no more knew his representations to be false than to be true. However, by the same token, I also conclude that he made the statement with reckless disregard for the truth of his averments. Citizens contends, and I find, that in signing the affidavit, Barry was following counsel's advice and instruction to endorse the statements that counsel had drafted for

---

rate agreement would bear on the firm's billing and Citizens's payments pending ultimate collection of the firm's fees from the Debtors. Without

question, Mastrovich believed and knew the blended rate agreement applied to these cases.

him. But this does not excuse his misrepresentations or make them any less reckless.

### D. *Citizens*

As a party moving for allowance and recovery of attorney's fees against these Debtors, Citizens was obligated to research and accurately represent to this Court the extent of Citizens's liability for attorney's fees. It would have been so obligated even if the fee agreement had simply been to pay standard hourly rates without any contingency. The dual-rate agreement between the parties and the fact that the Debtors, as indemnitors, were obligated to pay no more than Citizens itself was obligated to pay only heightened the obligation. A reasonably prudent person in the Bank's position would have more thoroughly researched the issue than Citizens did. Barry conducted no inquiry at all. Baldiga inquired of Mastrovich, who knew the answer, but Mastrovich misled him and concealed the underlying agreements.

As an institution that routinely looked to its borrowers to pay its legal fees, Citizens should reasonably have put in place and used a mechanism by which its loan officers and attorneys could ascertain and accurately represent to the borrowers—and the courts—the fee agreements that underlie their payment obligations. If Citizens had such a mechanism, there was no evidence of it in this case. Through Edward Barrett and the department he headed, Citizens did maintain records of its fee agreements with outside counsel, but Barrett had no role in administering individual loans; and I have no evidence that Citizens had mechanisms or procedures for sharing this information with its loan officers. Certainly Barry did not follow any such procedure.

The Court concludes that the misrepresentations in Citizens's motion and in the supporting affidavit were the result of Citizens's negligence in conducting its inquiry into the underlying fee agreement, but also, in Barry's case, of reckless disregard for the truth, and, to the extent of Mastrovich's involvement in the process, of intent to deceive.

### 6. *Subsequent Concealment*

The Debtors allege that Citizens continued to conceal the agreement after it filed the motion by making further misrepresentations to the Court and by withholding evidence demanded in discovery requests. The Court finds as follows. After the motion was filed, Citizens, through Baldiga, did initially deny to the Court and to the Debtors that BRF & G had been retained at anything other than standard hourly rates, but only because Baldiga himself continued to believe that was the case. When Baldiga learned of the blended rate agreement, he disclosed the agreement to the Debtor; and he turned over to the Debtor the relevant documents of which he had knowledge. Citizens and BRF & G did not produce some of the relevant documents in their initial response to the Debtors' document requests, but only because the documents were forgotten or in obscure locations, not for want of cooperation. As Citizens and BRF & G found these documents, they turned them over to the Debtors. Moreover, with the exception of Mastrovich, the representatives of Citizens and of BRF & G who testified at this hearing—especially Baldiga and Barrett—were cooperative and forthcoming in their testimony. Of all the witnesses, Barrett and Mastrovich were the most familiar with the agreements, and Barrett made no attempt to hide them or misrepresent their application to these cases.

Mastrovich, on the other hand, was not always truthful about the applicability of the blended rate agreement to these cases. On July 10, 1996, at the preliminary hearing on this motion, he testified that, from his acquisition of the Bishay matter in February, 1995 until June, 1996, he always understood that the Bishay matters were subject to normal hourly rates, regardless of whether the Bank recovered its attorney's fees from the Debtors. This testimony was belied by invoice letters that BRF & G had issued to Citizens on the Bishay matter from as early as November, 1995. The letters, which were introduced at the preliminary hearing, set forth the amount owed at the blended rate, and stated, "If ... Citizens is responsible for payment of our bills and not the borrower,

then pursuant to the blended rate agreement, Citizens may pay the discounted amount in full satisfaction of the attached bill." The letters went out over Mastrovich's name. Mastrovich testified that his secretary signed his signature on the letters, which is true. But Mastrovich also testified that he had not authorized her to prepare and send out these bills at the blended rate, which was not true, and deliberately so. Even at this stage of the proceedings, Mastrovich continued his attempt to conceal from the Court and the Debtors the nature of the agreement. However, Mastrovich's misrepresentations at the preliminary hearing did not mislead, Citizens itself having already produced the evidence by which the misrepresentations were undermined.

In sum, the Court finds that, aside from Mastrovich, Citizens and its counsel did not intentionally misrepresent or conceal the agreements after the filing of the motion. Mastrovich did intentionally misrepresent the agreement, but his misrepresentation was to no avail.

### 7. *Remedy*

■ The Debtors argue that Citizens's misrepresentations warrant denial of Citizens's motion in its entirety or, at the very least, disallowance of compensation for the entire amount of BRF & G's fee. And, under F.R.Bankr.P. 9011(a), the Debtors also seek sanctions, consisting of the reasonable attorneys' fees incurred by the Debtors in uncovering the blended rate agreement and opposing the fee portion of this motion. Citizens, having already reduced its demand for reimbursement to BRF & G's blended rate, argues that no further reduction is warranted and that no sanction should enter under Rule 9011(a).

### A. *Rule 9011(a)*

The Court will begin with Rule 9011(a). In relevant part, it provides that the signature of an attorney or a party on a motion or other paper filed in a bankruptcy case

> constitutes a certificate that ... to the best of the attorney's or party's knowledge, information, and belief, formed after reasonable inquiry it is well grounded in

fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law.

F.R.Bankr.P. 9011(a). This case involves two signatures: that of Richard Barry, as representative of Citizens, on the affidavit; and that of Kelly A. McEnaney, for herself, William Baldiga, and BRF & G, all as attorneys for Citizens. In both cases, the signed documents contained misrepresentations of fact, as have been outlined above. Both misrepresented the terms of the fee agreement between Citizens and BRF & G; Barry further misrepresented the extent of his knowledge of the agreement and of the fees incurred. In neither case was the crucial representation formed after reasonable inquiry into the facts. Barry, whose affidavit was submitted as the evidentiary support for the motion, was not familiar with the facts and had conducted no inquiry; and BRF & G's investigation into the facts was inadequate. In sum, both documents were signed and filed in violation of the rule.

Where a document is signed and filed in violation of the rule,

> the court on motion or on its own initiative, shall impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee.

F.R.Bankr.P. 9011(a). The rule thus requires that the Court impose an appropriate sanction, but it does not define what is appropriate, leaving that determination to the Court's discretion. Also, the rule permits the Court to impose the sanction on the party (as opposed to counsel) on either of two grounds: for its own violation of the rule or on account of counsel's violation of it. In this instance, the Debtors have moved for sanctions only against Citizens, but they have done so on both grounds: for Citizens's misrepresentations in Barry's affidavit, and for counsel's misrepresentations in the motion.

The sanction should be appropriate to the following considerations. First, neither Citi-

zens nor BRF & G conducted a reasonable inquiry into the facts before filing their respective documents. Barry's blind endorsement of the affidavit prepared for him by counsel can only be called reckless. And, especially in view of the dual nature of the fee agreement negotiated between Citizens and BRF & G, the care exercised by Citizens and counsel in preparing this motion and seeking compensation from the Debtors was far below what was due.

Second, the misrepresentations warranted and necessitated the discovery and litigation they have engendered. Though Citizens reduced its demand for reimbursement, the reduction neither eliminated the full difference between standard hourly rates and the blended rate [15] nor eliminated the expenses and disbursements that were not compensable. But even if the reduction had fully · eliminated these amounts, it still would not have obviated the Debtors' justification in conducting discovery and litigating this portion of its objection to Citizens's motion. The misrepresentations, the nature of the underlying agreement, and the preliminary evidence on the matter created an appearance of wrongdoing that fully justified the Debtors' discovery efforts and the hearing on this complex of issues. And, in the end, the Debtors established not only significant negligence in presenting the facts, but also reckless disregard for the truth and, on the part of Mastrovich, intentional concealment and misrepresentation of the underlying agreements.

Third, on the other side of the ledger, Citizens, especially through William Baldiga, came forward with evidence of the agreement and cooperated in resolving this matter. Mastrovich was the exception here, but his misleading testimony does not negate Citizens's real efforts in this regard.

Fourth, the interest, costs, and especially legal fees that are the subject of this motion were necessitated in part by the Debtors' intransigence in the Chapter 11 case and their inability or failure to propose a confirm-

able plan for payment of the claims of Citizens and the other creditors of these estates. By all accounts, these Debtors are solvent and had the resources to pay Citizens's claim long ago, a move that would have obviated the need for these bankruptcy cases and for the substantial interest and fees that are the subject of this motion. Even after filing these cases, the Debtors made no realistic proposal; they refused to part with assets to fund these plans, clinging instead to hopes of refinancing without regard to delay. The only progress that has been made in these reorganizations has been made because Citizens itself, through BRF & G, filed and obtained confirmation of a third-party plan of reorganization. Citizens's aggressive strategy was perfectly appropriate to these cases— the Debtors' themselves made it necessary— and Baldiga's work in these cases was of the high quality needed to execute it. Even in light of the misrepresentations now at issue, it would be both inequitable and out of proportion to the harm done to deny Citizens compensation for the interest, costs, and fees at issue in this motion.

For these reasons, the Court will enter a sanction against Citizens in the amount of the reasonable attorneys' fees that the Debtors incurred in filing their supplemental opposition to this motion, conducting discovery on the blended-rate agreement complex of issues, and in litigating those issues; this amount will be set off against the dividend to be paid on Citizens's allowed secured claim. The Court will also deny reimbursement to Citizens for the attorneys' fees it incurred in conjunction with the present motion.[16] No further sanction is warranted under Rule 9011(a). The Court will not, as a sanction, deny Citizens's motion (in its entirety) or the portion thereof that pertains to BRF & G's fees.

## B. Other Arguments for Denying All Fees and Interest

■ The Debtors advance two additional arguments for denying the motion in its en-

15. See footnote 5 above.

16. Those fees were incurred after the present motion was filed and therefore are not among

the fees for which compensation is now being requested.

tirety. The first is that the intentional filing of a false claim, and the claimant's intentional failure to disclose relevant information, are grounds for denying the claim in its entirety. The Court rejects this argument on two grounds. First, Mastrovich acted with intent to deceive, but Baldiga and the relevant officers at Citizens, Barry and Barrett, did not. To measure the extent of Citizens's fraudulent intent, Mastrovich's conduct has to be seen in context as only one part of the picture.

Second, Citizens's wrongdoing here affected only the portion of the motion dealing with BRF & G's fees and expenses. It had nothing to do with the sizable interest component of the motion and with the other costs itemized therein. And even as to BRF & G's fees and expenses, which total $262,419.40, the blended rate agreement would reduce the fees by $17,571.50; and the agreement as to expenses and disbursements would, even if it eliminated all expenses requested, reduce the expenses by $24,299.00, for a total difference of $41,870.50. This is a large sum, but small in relation to the fees and expenses that could legitimately have been requested. In view of these limitations, Citizens's misrepresentations and concealment do not warrant sanctions beyond those that the Court will impose under rule 9011(a).

The second argument is that the contract between Citizens and the Debtors, insofar as it may obligate the Debtors to pay more than Citizens itself was obligated to pay under the blended rate agreement, is unenforceable because it is either void as contrary to public policy or illegal as performed by Citizens. The Court rejects this argument because (as I ruled above) the blended rate agreement, in conjunction with the Debtors' agreement to indemnify Citizens for its attorney's fees, cannot, by its logical structure, ever obligate the Debtors to pay more than Citizens was already obligated to pay: the lesser of the blended rate or standard hourly rates and, in either case, only those expenses authorized by Citizens. Nothing about the blended rate and indemnity agreements, *so construed,* is void, illegal, or unenforceable.

For these reasons, the Court holds that the Debtors have not shown cause to deny the motion in its entirety or to deny in its entirety the portion of the motion dealing with BRF & G's fees and expenses. The remedy for Citizens's misrepresentation shall be limited to the sanction set forth above under Rule 9011(a).

## C. *Other BRF & G Fee Issues*

The Debtors raise several further objections to BRF & G's fees.

### 1. *Time Entries*

The Debtors argue that the firm's time entries are inadequate in several respects, such that the Court cannot determine whether the time was reasonably expended and warrants compensation.

#### A. *Entries Repeated Verbatim*

 The Debtors allege that, in various months, Attorney Steven Mastrovich often repeated verbatim a single lengthy time entry. The invoices bear this out. Over the thirteen months of his involvement in the Bishay matter, Mastrovich billed a total of 236.8 hours. Of this, 74.8 hours was documented by use of lengthy entries—each contained numerous items—that were copied verbatim from earlier entries.[17] The entries make it impossible to determine which tasks Mastrovich performed on any given day, and how long he spent on each task. Moreover, as Mastrovich concedes, he did not draft these entries as he completed the described tasks, but usually days later. This substantially diminishes the accuracy and reliability not only of the descriptions, but also of the tally of time spent.

Citizens maintains that these entries accurately reflect the amount of time reasonably spent by Mastrovich on these matters. However, in recognition of the poor quality of the entries as time descriptions, Citizens has voluntarily reduced its fee request by $21,692.50 (after reduction of the fee request to the blended rate), representing 111.25 hours at the blended rate. This reduction more than eliminates any compensation for the 74.8

---

17. This does not include the first time each such entry appears.

hours described by these entries.[18] No further adjustment is necessary.

## B. *Failure to Maintain Contemporaneous Records*

The Debtors state that many of Mastrovich's time entries, by their nature, must not have been recorded as he rendered the services. The Court finds that indeed the entries in question were not made contemporaneously. However, these are the same entries as those for which Citizens has voluntarily reduced the compensation requested for BRF & G fees, so no further reduction is necessary. Citizens points to a few additional entries by Mastrovich and Kelly McEnaney: for Mastrovich, entries that appear on a March 1996 invoice for work performed in the last week of February; and for McEnaney, entries that appear on a May invoice for work performed in the last week of April. I find that in these cases, the records were made contemporaneously and appeared on a later invoice only because they weren't processed in time to appear on the appropriate invoice. They warrant no adjustment.

## C. *Other Inadequate Entries*

██ The Debtors challenge numerous entries in which BRF & G attorneys "lumped" several tasks in a single time entry, making it impossible to determine how much time was expended on each task. Many of these are the Mastrovich entries for which Citizens has already made adjustment, but many more were made by other attorneys. The Debtors also challenge numerous entries by various attorneys for inadequate descriptions of the tasks performed, which make it impossible to determine whether the time described was expended reasonably. And the Debtors complain that Mastrovich recorded a substantial portion of his time entries in half-hour increments. This last complaint is not well established and, in any case, simply reiterates the complaint against Mastrovich for failure to keep contemporaneous time entries. However, the objections for "lumping" and inadequate description charges are

justified. The Court counts 144 hours for which the lumping charge is appropriate (not including Mastrovich's repetitive entries, for which adjustment has already been made) and 25 more for which the description supplied is otherwise inadequate. These warrant disallowance of a portion of the time so billed. *In re Smuggler's Beach Properties, Inc.*, 149 B.R. 740, 743 (Bankr.D.Mass.1993) (reduction of compensation is appropriate where time records inadequately describe services or provide insufficient detail); *In re Kalian*, 178 B.R. 308, 318 (Bankr.D.R.I.1995) (lumping in fee application makes it impossible to review the time devoted to a particular task). The Court would disallow twenty percent of the time billed, approximately 34 hours. However, because Citizens has already reduced its demand by 37 hours in excess of that warranted by Mastrovich's duplicative entries, the Court holds that no further reduction is warranted.

## 2. *Overstaffing and Failure to Delegate*

██ The Debtors complained that BRF & G assigned too many attorneys to some matters, which needlessly increased the time required by attorneys to familiarize themselves with the matters and increased the time spent on interoffice conferences. The Court finds that BRF & G did on some matters overstaff the case, warranting a reduction of approximately twenty-six hours of allowable time, most of which was time expended by Mastrovich on bankruptcy matters. Mastrovich testified repeatedly that, after these cases were commenced, he merely handed the cases over to Baldiga, who assumed primary responsibility for them, and provided occasional advice about real estate issues. He also testified that he had no expertise in bankruptcy. Nonetheless, without explanation, his billings remained substantial throughout the cases. The Court finds that much of his effort merely duplicated work that Baldiga and McElaney were already handling competently and more efficiently on their own.

██ The Debtors also complain that BRF & G often failed to delegate matters to less

---

**18.** At the blended rate of $195 per hour, the duplicative entries total $14,586.00; at standard hourly rates, $19,775.00 [consisting of 31.8 hours at $250/hour, plus 43 hours at $275/hour].

senior attorneys and to paralegals and administrative assistants. However, failure to delegate from senior to junior attorneys is not a problem where all attorneys are billing at a uniform rate, as they are under the blended rate agreement. The Court found a few instances of attorneys doing work that might have been assigned to paralegals or other nonattorneys, but these warrant a cumulative reduction of only two hours. Therefore, the Court will reduce the allowable time by a total of twenty-eight hours on account of these complaints.

### 3. Unnecessary and Incompensable Tasks

 The Debtors contend that BRF & G billed for several tasks that were unnecessary. The Court agrees that some of these were unnecessary and should not be compensated: researching and drafting a memo on cigarette taxes (2.7 hrs); and objecting to creditors' claims (2.2). The former was irrelevant; and the latter was the Chapter 11 Trustee's duty and the Debtors' prerogative.[19] The remaining tasks were not unnecessary: attempts to repossess Bishay's automobiles, which are part of Citizens's collateral; a motion to disqualify Bishay's counsel; objections to Bishay's claims of exemption; and the defense against Bishay's lender liability claim against Citizens.

The Debtors also complain about the 10.6 hours expended by BRF & G in connection with a lease-financing program whereby Citizens finances third-parties' leasing of automobiles from a business entity in which Bishay holds an interest. Bishay contends that he is not in default on the lease-financing program, and that the program has no bearing on these bankruptcy cases. Citizens has made no response to this objection. Having no evidence of the necessity of these efforts, the Court will disallow the time expended on them.

In sum, the Court will disallow an additional 15.5 hours as unnecessary or incompensable.

### 4. Excessive Fees on Individual Tasks

The Debtors cite certain entries, aggregating approximately ten hours, in which Mastrovich allegedly expended excessive time on individual tasks. The Court agrees that this time appears excessive, but virtually all of it has already been eliminated on other grounds.

### 5. Excessive Fees in the Aggregate

 The Debtors also argue that BRF & G's fees are excessive in the aggregate because, they argue, Citizens was, from the start of these cases, always indisputably and abundantly oversecured, such that the debt owed to Citizens was never in serious threat of not being paid in full. The Court disagrees. It is true that Citizens has throughout these cases been well oversecured. However, despite their abundance of assets, the Debtors made an insufficient effort to advance a reasonable and confirmable plan of reorganization in a timely manner. It was clear to the Court and to Citizens from very early in these cases that the Debtors would not of their own accord move these cases forward until pressure was brought to bear. Citizens was not obligated to wait forever. Forced into an active role, Citizens obtained the appointment of a Chapter 11 trustee, filed a third party plan, and successfully brought its plan to confirmation. Moreover, it did so under a steady opposition from the Debtor that multiplied the costs at every turn. The fees are not excessive.

### 6. Expenses and Disbursements

 Citizens seeks reimbursement for expenses and disbursements by BRF & G totaling $24,299.90.[20] The Debtors object to these on two grounds. First and foremost, the Debtors point out that many of the disbursements are for items that, under the agreement between Citizens and BRF & G with respect to expenses and disbursements,

---

19. The Debtors also complained that BRF & G unnecessarily researched the propriety of charging interest on attorney's fees, but the Court has found no evidence of this.

20. The disbursements itemized in the invoices submitted with Citizens's motion total $24,299.90. The motion states that expenses totaled only $19,764.71, an amount the Court attributes to clerical error.

BRF & G was obligated to absorb as overhead. Citizens was under no obligation to reimburse BRF & G for these amounts. The Court agrees that the Debtors need not reimburse Citizens for expenses as to which Citizens had no obligation to BRF & G. These include all disbursements for copying, telephone, facsimile transmissions, binding, secretarial overtime, meals, and computerized legal research incurred after July 11, 1995, the date of the agreement on expenses and disbursements.[21]

■■■■ Second, the Debtors complain that the request for reimbursement and the underlying invoices do not adhere to the strict limitations on secretarial overtime, clerical services by paralegals, meals, parking, travel, and "miscellaneous" expenses that were articulated in *In re Bank of New England Corp.*, 134 B.R. 450, 455–460 (Bankr.D.Mass.1991), a decision to which I fully subscribe. The Court has already ruled that it will deny compensation for meals and secretarial overtime on other grounds. The Court will also deny compensation for disbursements explained only as "miscellaneous" or "general," because these labels provide no explanation at all. *Id.* at 460. However, the firm's parking and travel expenses were modest and appropriate under the *Bank of New England* standards, and the paralegal time is compensable and adequately described.

All that remains is the numbers. I begin with BRF & G's itemized disbursements, which total $24,299.90. From this I subtract the portions thereof attributable to copying ($4,280.20), binding ($86.87), facsimile transmissions ($1,382.25), telephone ($380.43), secretarial overtime ($630.00), meals and food ($65.37), computerized legal research ($1,690.21), and "miscellaneous" ($1,293.00), a total of $9,808.33. This yields allowable expenses and disbursements in the net amount of $14,491.57.

### d. *Conclusion as to BRF & G's Fees*

Citizens originally requested compensation for BRF & G's fees in the amount of $238,119.50. This amount consisted of compensation for 1060.7 hours of attorneys' time at standard hourly rates in the total amount of $224,408.00, plus compensation for 99.3 hours of paralegal time in the total amount $13,306.50. Using the prescribed lodestar analysis, the Court begins by multiplying the number of hours reasonably expended by a reasonable hourly rate. The Court holds that the rate prescribed in the blended rate agreement—$195 per hour for all attorneys' time—is a reasonable hourly rate for the work performed, and that 908.4 of the attorneys' hours billed by BRF & G were reasonably expended.[22] This yields compensation for attorneys' time in the total amount of $177,138.00. To this should be added the compensation for paralegal time of $13,306.50,[23] and allowable expenses and disbursements of $14,491.57. In sum, the Court will allow compensation to Citizens for BRF & G's fees and expenses in the total amount of $204,936.07, subject to the sanctions outlined above.

### DEFAULT RATE OF INTEREST

■■■ Citizens seeks allowance of postpetition interest on its claim at the default rate of interest, which is prime plus three percent,[24] through the date of payment. At the default rate, the interest accrued through May 17, 1996, totals $119,036.25. The Debtor objects to use of the default rate of interest, arguing that it effectively compensates the Bank a second time for the same increase in administrative costs that the Bank's late fees are intended to cover. At the preliminary hearing on this motion, the Court ruled on the record that Citizens was entitled to

---

**21.** This ruling renders moot the Debtors' objection that copying, binding, and faxing charges should be denied on account of Citizens's failure to indicate the volume, the cost per page, and the actual cost of these items.

**22.** To summarize, the Court disallowed 74.8 hours for Mastrovich's duplicative entries, 34 hours for lumping and other inadequate time entries, 28 hours for overstaffing and failure to delegate, and 15.5 for unnecessary and incompensable tasks, a total of 152.3 hours. The 1060.7 hours billed by BRF & G, less the 152.3 hours disallowed, yields 908.4 allowable hours.

**23.** Under the blended rate agreement, paralegal services remained at standard hourly rates.

**24.** The normal rate is prime plus one percent.

postpetition interest at the default rate prescribed in Bishay's loan agreement with Citizens. The Court now merely reiterates that ruling.

### LATE FEES

Citizens seeks to recover late fees of $8,388.99 that have accrued through May 17, 1996. The Debtors object to this charge, arguing that it would constitute a second recovery for the same loss as is covered by the default rate of interest. The Court agrees. Both the late charge and the default rate of interest are intended to compensate the lender for the increased costs of administration caused by the borrower's failure to make payment as and when it is due.[25] Citizens can recover one or the other, but both would be inequitable and unreasonable within the meaning of § 506(b). *In re Kalian,* 178 B.R. 308, 312 n. 9 and 316 n. 18 (Bankr. D.R.I.1995). Therefore, the late fees will be denied.

### APPRAISAL FEES

■ Citizens also seeks to recover appraisal expenses totaling $11,175.00, consisting of the fees incurred for ten separate appraisals. The Debtors object to payment of these expenses on two grounds. First, Citizens has provided no information whatsoever about the necessity or reasonableness of these appraisals. This is true, but the necessity of the appraisals is self-evident: Citizens needed to know and monitor the value of the properties that secured its claim. Moreover, the Debtors have not articulated a specific objection to or question about the reasonableness of the fees, so Citizens has not fairly been put on notice as to what it must establish.

Second, the Debtors cite "impropriety in the preparation and use of the appraisals, as demonstrated by the testimony elicited at the evidentiary hearing held on April 18, 1996." The Court has reviewed the testimony from that hearing. The testimony on appraisal issues was lengthy and touched on a number of distinct appraisal-related issues; and it pertained to only one of the ten appraisals for which compensation is now being sought.

The Debtors do not identify or cite the specific testimony on which they rely. They offer no argument as to why the alleged improprieties warrant denial of the appraisal fees. Nor do they even identify the improprieties they have in mind. In short, the Debtors have not articulated this objection in sufficient detail to permit either Citizens or the Court to understand, respond to, and adjudicate the substance of their objection.

The compensation sought for these appraisals is reasonable and will be allowed in the amount requested.

### FEES OF GOODWIN, PROCTER & HOAR

■ Citizens seek compensation for prepetition legal fees in the amount of $543.19 for which it is obligated to the law firm of Goodwin, Procter & Hoar. The Debtors object to this charge because Citizens has provided no description of the work performed and no daily time records. This objection is justified. Citizens states only that it incurred these fees "in connection the Note." It has provided no time records and no description of work performed. Absent these, the Court cannot determine whether the fee is reasonable. Therefore, Citizens will be denied compensation for this fee.

### CONCLUSION

For the reasons set forth above, the Motion of Citizens Bank of Massachusetts for Approval of Interest and Reasonable Fees, Costs and Charges Pursuant to Section 506(b) will be allowed in part and denied in part as follows. The Court will allow postpetition interest at the default rate, deny late fees, deny compensation for the legal fees of Goodwin, Procter & Hoar, allow appraisal expenses in the amount of $11,175.00 as requested, and allow compensation for the attorney's fees and expenses of BRF & G in the amount of $204,936.07. Also, the Court will enter a sanction against Citizens under Rule 9011(a) in the amount of the reasonable attorneys' fees that the Debtors incurred in filing their supplemental opposition to this motion, conducting discovery on the blended-rate agreement complex of issues, and in litigating those issues. The sanction shall be

---

**25.** See Affidavit of Richard Barry, ¶¶ 4–11.

set off against the dividend to be paid on Citizens's allowed secured claim. The Court will also deny reimbursement to Citizens for the attorney's fees it incurred in conjunction with the present motion. A separate order will enter accordingly after quantification of the reasonable fees to be assessed under Rule 9011(a). The Court will issue an order as to the procedure on quantification of fees.